## Case No. 14,821.

### UNITED STATES v. COCHRAN et al.

### [2 Brock. 274.] 1

Circuit Court, D. North Carolina. Spring Term, 1825.

UNITED STATES—PRIORITY—DEBT DUE FROM REVENUE OFFICER—APPROPRIATION—SURETIES ON BOND—PAYMENT.

1. An act of congress—Act March 3, 1797, § 5 [1 Stat. 515]—declares. that where a revenue officer, indebted to the United States. shall become insolvent, the debt due to the United States shall first be satisfied. and that this priority shall extend to cases where a debtor. not having a sufficient property to pay all his debts, shall make a voluntary assignment thereof. *Held,* that although this act gives to a debt due to the United States a priority over debts due to individuals, it does not give to one part of a debt due to the United States a priority over any other part of it; nor does it vest the property absolutely in the United States, though it gives them a right to pursue it for the purpose of appropriating it in payment: nor does it affect the right of the debtor to apply a payment of money in his hands to either a bond debt. or a debt due by open account by him to the United States.

[Distinguished in Leggett v. Humphreys. 21 How. (62 U. S.) 77.]

2. Therefore, where a collector of the revenue at a port. had given bond with sureties in the penalty of $10,000. for the faithful discharge of

1 [Reported by John W. Brockenbrough, Esq.]

his official duties, and being largely indebted to the United States, had made a deed of his property for their benefit, but previously thereto. had transferred $10,000 to his sureties, and directed them to apply that money to their exoneration, and the sureties accordingly did so apply it. by paying it into the treasury, and receiving from the treasury their obligation, without any knowledge at the treasury that the money so paid had been transferred by the collector himself to his sureties: it was adjudged that by applying that payment to the extinguishment of the bond. the sureties were discharged.

An information was filed in the circuit court of the United States for the district of North Carolina. against Robert Cochran, late collector for the port of Wilmington in that state. and J. E. and J. W., his sureties, to recover from the sureties the sum of $10,000, that being the penalty of Cochran's official bond. The information charged, that the said Cochran being largely indebted to the United States beyond his ability to pay, viz., in the sum of $145,361, two several suits were instituted, the one against Cochran, the principal, and the other against his sureties. and that judgments had theretofore been obtained against each in the circuit court of the United States for the district of North Carolina; that the judgment against the sureties (for $10,000) had been satisfied by them. but the execution sued out on Cochran's judgment had proved unproductive; that Robert Cochran, intending to defraud the United States, &c., on the 25th of September. 1820, conveyed by deed of that date, to W. W. J. and J. W., (the latter of whom was one of his sureties) all or nearly all of his visible property in trust, for the benefit of the United States. but that nevertheless the said Cochran was possessed of a large sum of money, which he placed in the hands of J. W., one of his sureties. or others, upon a secret trust, out of which the judgment against the sureties was satisfied. The information charged, that the original liability, by reason of the defalcation of their principal, was unimpaired by the payment by them of $10,000 out of the funds of Robert Cochran, and prayed for relief, &c.

The answers of Cochran and his two sureties disclosed, inter alia. the following state of facts. viz.: That on the 18th of August, 1820, in order to indemnify his sureties, Cochran had put up. in bills of North Carolina banks. the sum of $10,000. in two separate packages of $5.000 each, sealed up and addressed to the sureties respectively, which were placed in a trunk, and the trunk was deposited in the bank of Cape Fear, at Fayetteville, of which bank J. W., the surety, was cashier. Cochran, in his answer, insisted that he was thus divested of all right and title to the said money, though he admitted that he did not inform his sureties of the said transfer, believing it to be complete without any such communication. He farther answered. that he did not. at the time of making the transfer. contemplate the execution of the deed of the 25th of September, 1820, referred to in the information, or com-

mitting any other act of legal bankruptcy, by absconding or otherwise, but that the appropriation of the $10,000 and the subsequent execution of the deed, were totally distinct transactions in fact and in design: That a few days after the transfer of the money, he went to Wilmington in the execution of the duties of his office as collector, and having there received official notice of his reappointment, by which he was required to renew his bond in the sum of $30,000, in pursuance of the act of congress, and being resolved not to involve his friends by giving a new bond, the propriety of making an assignment of his property then first occurred to him, and without the counsel or knowledge of any person whatever, he executed the deed on the day of its date, at Wilmington. That he carried the deed with him to Fayetteville early in October, 1820, and deposited it in the trunk in the bank of Cape Fear, containing the package of money: That having determined to retire from office, and under the influence of feelings too poignant to endure the shock among his friends, which would be produced by the publication of his default, he determined to go to the North. From Baltimore he addressed a letter to J. W., one of his sureties, and cashier of the bank of Cape Fear, informing him that he had deposited the two packages of money in the trunk before referred to. and desiring him to deliver to his co-surety, J. E., the package superscribed with his name, and to retain the other. The sureties, in their answer, averred, that this letter was received, and the money applied to the satisfaction of the judgment against them accordingly. and that their bond was thereupon surrendered by the treasury.

MARSHALL, Circuit Justice. In this case Robert Cochran, collector at the port of Wilmington, being very largely indebted to the United States, made a deed of his property for their benefit. Previous to the execution of this deed, he deposited $10,000, the amount of the bond executed to the United States, for the faithful performance of his duty, in a trunk which was placed in the bank, and absconded. From Baltimore he addressed a letter to his sureties, requesting the trunk to be taken out of the bank. and the money to be applied to their exoneration. The money was received at the treasury and the bond given up. It being afterwards discovered that this was the money of the collector and not of the securities, this suit is brought to compel the securities to pay the amount of the bond, considering the money received as constituting no equitable discharge to them.

It is contended on the part of the United States, that the insolvency of Cochran. vested all his property, including this $10,000, in the United States. and that this sum being theirs could not be applied in exoneration of his securities. The act of congress declares, that where any revenue officer, &c., indebted to the United States. shall become insolvent, the debt due to the United States shall be first satisfied, and that this priority shall extend to cases where a debtor not having sufficient property to pay all his debts, shall make a voluntary assignment thereof. Act March 3, 1797, § 5. See 1 Story's Laws, 465 [1 Stat. 515]. This act does not transfer the property itself to the United States, but subjects it to their debt in the first instance. The assignee holds it as the debtor would hold it, liable to the claim of the United States, and if he converts it to his own use, or puts it out of reach of the United States, he is undoubtedly responsible for its value. But the property thus liable to the United States, is liable for the whole debt; for one part of it as much as for the other. It is as applicable to the bond in which the sureties are bound, as to that part of the debt for which the principal alone is responsible. No person will doubt the legal capacity of the United States to apply any sum of $10,000. to the discharge of the bond-debt, leaving the residue unpaid. Such an application of a payment would undoubtedly never be presumed from any equivocal act; but a plain and positive appropriation of a payment to the bond, could not afterwards be set aside. But the power of the debtor to apply his payments, is co-extensive with that of the creditor, and is to be exercised in the first instance. This principle has, it is believed, never been denied. If it be correct, then the power of Mr. Cochran to apply this sum of money in discharge of the bond, and in exoneration of the sureties to it, is co-extensive with that of the United States to make the same application of it. If, then, Mr. Cochran had, without any assignment of his property, paid this money into the treasury, with a direction that it should be applied to the bond. he would have exercised a right which the law gives to every debtor. If the money should be received under this direction, no doubt can be entertained of the obligation to apply the payment as directed. If it should be rejected, it might be tendered in due form. and to suits brought on the bond. and on the open account a tender might be pleaded to the suit on the bond, unless some distinction can be taken between this bond, and the common case of a bond given for part of a debt. The court has reflected on this distinction, and cannot perceive any legal difference between the cases.

Does the transfer of this money to the sureties change the law of the case? We think not. The sureties have paid it into the treasury in discharge of their bond. which has been delivered up. Had this transaction taken place, with the full knowledge of the treasury department that the money had been received by the sureties from Mr. Cochran, no question could have arisen respecting it. Is the payment the less valid because it was made without communicating this circumstance? If the United States

have sustained any injury by the concealment, equity will relieve against that injury, and place them in the situation in which they stood before the payment was made. If, with full knowledge of the circumstance, the money might still have been legally applied in discharge of the bond, then, the fact that it was not communicated cannot change the law.

It has been very properly argued, that the act of congress gives to the debt due to the United State priority over debts due to individuals, but not to one part of the debt due to the United States over any other part of it; nor does it vest the property absolutely in the United States, though it gives them a right to pursue it for the purpose of appropriating it in payment. It would seem to follow, that the right to apply payments while the money is in the hands of the debtors, is not affected by the act of congress, but remains as it would stand, independent of that act. If, then, the sureties had declared to the treasury department that the money was received from Mr. Cochran, to be paid in discharge of their bond, and had tendered it in payment thereof, we think the tender would have been valid, and might have been pleaded to a suit on the bond.

We are of opinion, therefore, that this suit must be dismissed as against the sureties.